1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Dawn Beville, individually; Paul Baxter)   No. 03-237-PHX-ROS
    Beville III; Diane Beville; and Dawn)
10  Beville, Personal Representative, for and)   **OPINION AND ORDER**
    on behalf of the Estate of Paul Baxter)
11  Beville IV,                            )
                                           )
12            Plaintiffs,                  )
                                           )
13  vs.                                    )
                                           )
14                                         )
    Ford Motor Company, Inc., a foreign)
15  corporation; Trail King Industries, Inc., a)
    foreign   corporation;   Citicapital)
16  Commercial Leasing Corp., a foreign)
    corporation; and John Does 1-50, in their)
17  official and individual capacity, Black and)
    White Corporations I-V; Black and White)
18  Partnerships I-V,                      )
                                           )
19            Defendants.                  )
                                           )
20  _____)

21

22
           Pending before the Court are motions for summary judgment filed by both parties,
23
    motions to strike filed by both parties, and various other procedural motions.  The following
24
    discussion resolves all motions currently pending in this case.[1]
25

26         [1] The Court did not set this matter for oral argument because the parties submitted
27  memoranda thoroughly discussing the law and evidence in support of their positions, and oral
    argument would not have aided the Court's decision.  See Mahon v. Credit Bur. of Placer
28  County, Inc., 171 F.3d 1197, 1200 (9th Cir. 1999).

1

**BACKGROUND**

2      The following facts are not disputed. This action stems from an industrial accident
3  that occurred on January 25, 2001 in Casa Grande, Arizona. (Doc. 141 at 2) On that date,
4  Paul Beville IV was at his job as rental equipment manager for Bingham Equipment
5  Company. Mr. Beville was helping his coworker James Sears unload a non-functioning front
6  end loader from a flat bed trailer. The flat bed trailer was attached to a 1997 Ford semi-
7  tractor. (Doc. 145 at 2) Because the front end loader was not working, the loader was going
8  to be towed off the trailer by a forklift. Mr. Sears parked the trailer but Mr. Beville decided
9  that they should move the trailer closer to a maintenance bay to make it easier to service the
10  loader. Mr. Sears was instructed to move the trailer closer to the bay. Mr. Sears entered the
11  semi-tractor intending to move the semi-tractor forward towards the maintenance bay. Mr.
12  Sears, however, noticed that another vehicle was blocking his intended path and he decided
13  to back up the semi-tractor a short distance before moving forward. Mr. Sears backed up
14  approximately three feet and then moved forward closer to the maintenance bay. Prior to
15  backing up, Mr. Sears did not sound his horn. The semi-tractor did not have a back-up alarm
16  or other similar system installed. Mr. Beville was crushed between the trailer and the
17  forklift, sustaining fatal injuries.

18      On January 7, 2003, Dawn Beville, Paul Baxter Beville IV's spouse, as well as Paul
19  Baxter Beville III and Diane Beville, Paul Baxter Beville IV's parents, filed a complaint in
20  Maricopa County Superior Court. (Doc. 1, ex. A) That complaint contained counts against
21  Ford, the manufacturer of the semi-tractor, Trail King, the manufacturer of the trailer, and
22  Citicapital, the entity leasing the tractor and trailer to Bingham Equipment Company. Ford
23  removed the case to federal court, based on diversity jurisdiction. (Doc. 1) Trail King and
24  Citicapital were eventually dismissed from the suit, leaving Ford the only defendant. (Doc.
25  100, 169) Plaintiffs assert four claims against Ford: 1) product liability; 2) negligence; 3)
26  gross negligence; and 4) punitive damages. All of these claims are based on Ford's failure
27  "to design the tractor to include a device or system that would alert a person to the rear of the

28

- 2 -

tractor when the tractor was about to and/or was actually moving in reverse." (Doc. 1, ex. A p. 4)  The lack of such a device or system allegedly made the tractor "defective and unreasonably dangerous." (Id.)

Relatively early in the litigation, Ford filed a Notice of Non-Party at Fault claiming that Bingham Equipment Co., James Sears, and Paul Beville IV "may be wholly or partially responsible for the accident." (Doc. 20, 21, 23)  Later, Ford filed three separate motions for summary judgment.  (Doc. 135, 136, 137)  In the first, Ford argues that "Plaintiffs' only evidence to support their claim that the subject semi-tractor is defective is the testimony of their experts." (Doc. 135 p. 5)  According to Ford, the experts' testimony would be inadmissible at trial and, therefore, Ford is entitled to summary judgment.  In the second motion, Ford contends that "the absence of an optional safety device cannot render a product defective and unreasonably dangerous."  (Doc. 136)  Finally, Ford's third motion for summary judgment argues that there is insufficient evidence to support an award of punitive damages.  (Doc. 136)

Plaintiffs filed their motion for summary judgment seeking to prevent Ford from asserting various defenses such as contributory negligence or misuse of the semi-tractor. (Doc. 140)  Plaintiffs also filed a Motion to Strike Ford's Notice of Non-Parties at Fault, arguing that it was improper to name Paul Beville IV as a non-party and that Ford should not name both Mr. Sears and his employer as non-parties at fault. (Doc. 139)  Both parties filed responses and replies to the various motions.  Plaintiffs later filed a Motion to Strike Ford's response to their motion for summary judgment due to impermissible length.  Ford acknowledged that its response exceeded the page limit due to counsel's oversight and asked the Court to retroactively grant permission to exceed the page limit. (Doc. 155)  Plaintiffs also filed a Motion to Strike Ford's response to the motion to strike non-parties at fault because the response was filed past the deadline prescribed in the Rules of Practice of the United States District Court for the District of Arizona ("Local Rules").  Plaintiff later sought

1  to strike portions of Ford's Statement of Facts submitted with its motions for summary
2  judgment. (Doc. 157, 158) Ford then sought to strike the Motions to Strike. (Doc. 167, 168)

3  **ANALYSIS**

4  This straightforward litigation has become needlessly confusing and time-intensive
5  due to conduct by both parties. A number of actions by Ford are especially troubling. Those
6  actions include numerous violations of the Local Rules, asking this Court to commit obvious
7  legal error by not following the Arizona Supreme Court on a settled issue of Arizona law,
8  misrepresenting facts in the record, and improperly raising new arguments in a reply brief.
9  In order to advance this litigation forward, the Court will focus only on the pending motions.
10  Whether the poor behavior warrants imposition of sanctions will be addressed in proceedings
11  independent of the resolution of the pending motions.

12  **I. Jurisdiction**

13  This case was removed from Maricopa County Superior Court based on 28 U.S.C.
14  § 1332 (diversity jurisdiction). (Doc. 1) Plaintiffs are all residents of Arizona and Ford is
15  a corporation incorporated under the laws of Delaware with its principal place of business
16  outside Arizona. The amount at issue exceeds $75,000. Therefore, diversity jurisdiction
17  exists.

18  **II. Applicable Law**

19  All of Plaintiffs' claims are tort claims. Such claims "are decided according to the law
20  of the forum state." Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407
21  (9th Cir. 1992). Thus, the Court will look to Arizona law to determine the applicable law.
22  According to Bates v. Superior Court, 749 P.2d 1367, 1370 (Ariz. 1988), a court must
23  "resolve tort issues under the law of the state having the most significant relationship to both
24  the occurrence and the parties with respect to any particular question." In this case, the
25  accident occurred in Arizona and "the conduct causing the injury" also occurred in Arizona.
26  Id. Also, the Plaintiffs reside in Arizona and the parties relationship was centered in Arizona.

27

28

1  <u>Id.</u> Finally, the parties do not dispute that Arizona law should apply. Therefore, the Court
2  will examine Plaintiff's claims pursuant to Arizona law.[2]

3  **III. Legal Standard**

4      A court must grant summary judgment if the pleadings and supporting documents,
5  viewed in the light most favorable to the non-moving party, "show that there is no genuine
6  issue as to any material fact and that the moving party is entitled to a judgment as a matter
7  of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).
8  Substantive law determines which facts are material, and "[o]nly disputes over facts that
9  might affect the outcome of the suit under the governing law will properly preclude the entry
10 of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In
11 addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury
12 could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

13     Furthermore, the party opposing summary judgment "may not rest upon the mere
14 allegations or denials of [the party's] pleading, but . . . must set forth specific facts showing
15 that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); <u>see</u> <u>Matsushita Elec. Indus. Co.,</u>
16 <u>Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  There is no issue for trial unless
17 there is sufficient evidence favoring the non-moving party; "[i]f the evidence is merely
18 colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>,
19 477 U.S. at 249-50 (citations omitted). However, "[c]redibility determinations, the weighing
20 of the evidence, and the drawing of legitimate inferences from the facts are jury functions,
21 not those of a judge." <u>Id.</u> at 255.  Therefore, "[t]he evidence of the non-movant is to be
22 believed, and all justifiable inferences are to be drawn in [its] favor" at the summary
23 judgment stage. <u>Id.</u> Finally, Rule 56(e) contemplates the result of a party's failure to respond
24 adequately to a motion for summary judgment. If the non-moving party does not respond by
25
26

27     [2] Inexplicably, Ford argues in a footnote that Michigan law may apply to the issue of
28 punitive damages.  This contention is addressed in Section V.

1  setting forth specific facts showing there is a genuine issue for trial, "summary judgment, if

2  appropriate, shall be entered against the [non-moving] party." Fed. R. Civ. P. 56(e).

3  **IV.  Product Liability, Negligence, Gross Negligence**

4        Two of Ford's motions for summary judgment are aimed at Plaintiffs' product liability,

5  negligence, and gross negligence claims. Ford presents two arguments related to these

6  claims. First, Ford argues that "Plaintiffs' only evidence to support their claim that the

7  subject semi-tractor is defective is the testimony of their experts, James Mundo, Vaughn

8  Adams, and Ken Laughery." (Doc. 135 p. 5) Ford believes that none of these witnesses

9  should be allowed to testify and, therefore, summary judgment should be granted in its favor.

10  Ford's second argument is that it had "no duty to add optional safety features on a truck" and

11  "the absence of an optional safety device cannot render a product defective and unreasonably

12  dangerous." (Doc. 136 p. 1) For the following reasons, the Court rejects both of Ford's

13  arguments.

14        **A.  Expert Testimony**

15        Ford argues that three experts offered by Plaintiffs are not qualified to testify and that

16  any testimony offered would be unreliable. Plaintiffs counter that Ford is misrepresenting

17  the intended scope of the expert testimony and that the reliability factors cited by Ford do not

18  apply in this case. Plaintiffs also point out that even if the Court were inclined to exclude the

19  experts' testimony, summary judgment would not be appropriate. The Court agrees with

20  Plaintiffs that precluding the expert testimony does not entitle Ford to summary judgment.

21  Therefore, the Court need not address the admissibility of the experts' testimony at this stage

22  of the case.

23        In Rossell v. Volkswagon of America, 709 P.2d 517, 521 (Ariz. 1985), the Arizona

24  Supreme Court addressed "[w]hat type of proof must [a] plaintiff produce in order to make

25  a prima facie case of negligent design against a product manufacturer[.]" The Arizona Court

26  of Appeals held that expert testimony was necessary to establish that a car had been

27  negligently designed. Id. The Supreme Court disagreed, finding that design defect cases

28

should be analyzed the same as standard negligence cases. "In determining what is reasonable care for manufacturers, the plaintiff need only prove the defendant's conduct presented a foreseeable, unreasonable risk of harm. As in all other negligence cases, the jury is permitted to decide what is reasonable from the common experience of mankind." Id. at 523-24. The Court recognized that "expert evidence may be required in those cases in which factual issues are outside the common understanding of jurors," but the court held that negligent design cases do not automatically require "explicit expert testimony establishing the standard of care and the manner in which defendant deviated from that standard." Id. at 524.

The Rossell case was cited by Plaintiffs in their response to Ford's motion for summary judgment. (Doc. 148) In its reply, Ford chose not to address the case or dispute Plaintiffs' argument that the exclusion of expert testimony did not entitle Ford to the relief sought. (Doc. 163) The Court is left with no argument by Ford that this negligent design case fits into the subset of cases "outside the common understanding of jurors," and the Court will not speculate that it does fit within that subset of cases. Id. On a motion for summary judgment, the moving party, here Ford, has the burden of persuading the Court that the opposing party cannot meet its burden of establishing an issue of fact for the jury. In re Agric. Research and Tech. Group, Inc., 916 F.2d 528, 533 (9th Cir. 1990) ("The moving party must point out why no genuine issue of material fact exists for trial."). Ford failed to meet this burden.

1  Therefore, even if the Court were to exclude the experts as requested by Ford,
2  summary judgment would not be appropriate.[3]  The Court will deny Ford's motion for
3  summary judgment based on alleged deficiencies in Plaintiffs' expert witness testimony.[4]

4  **B. Absence of Optional Equipment and Open and Obvious Danger**

5  Ford's second Motion for Summary Judgment argues that Ford is entitled to summary
6  judgment because "there is no duty to add optional safety features on a truck[] which are not
7  mandated by law." (Doc. 136, p.1) Ford also argues that the lack of a back-up alarm was
8  an "open and obvious" dangerous condition. (Id., p.7) Plaintiffs believe that Ford's duty is
9  not controlled solely by government mandates and that the dangerous condition was not open
10 and obvious. (Doc. 147) Neither of Ford's arguments find support in existing law and
11 summary judgment will be denied.

12 **1. Duty to Add Additional Safety Equipment**

13 Ford's argument regarding its duty to add optional safety features appears to be based
14 on federal safety mandates. According to Ford, "[a] manufacturer has no duty to equip its
15 vehicles with a safety device that is not mandated by Federal Motor Vehicle Safety
16 Standards." Apparently Ford believes that because the tractor-trailer was in compliance with
17 all federal safety mandates there can be no tort liability. In other words, the federal safety
18 mandates were a "ceiling" and no additional safety mandates can be required by any law.
19 Ford's argument was rejected by the United States Supreme Court more than ten years ago
20 and the two cases cited in support of Ford's position are distinguishable.

21

22 _____

23  [3] Summary judgment may be granted when expert testimony is excluded pursuant to
24 a Daubert motion. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993)
   (recognizing that insufficient expert testimony may lead to summary judgment); Domingo
25 ex rel. Domingo v. T.K., 289 F.3d 600, 607 (9th Cir. 2002) (affirming district court decision
   excluding expert testimony which led to summary judgment). But Ford failed to establish
26 that expert testimony was an *indispensable* part of Plaintiffs' case.

27  [4] The admissibility of Plaintiffs' expert witnesses will be resolved by the Court at the
28 Final Pretrial Conference.

- 8 -

1      In Freightliner Corp. v. Myrick, 514 U.S. 280, 289 (1995), two manufacturers of
2  tractor-trailers were sued under state tort law. The plaintiffs alleged that the manufacturers'
3  failure to include anti-lock braking systems on the tractor-trailers "was a negligent design that
4  rendered the vehicles defective." Id. at 283. The manufacturers defended by claiming that
5  the Federal Motor Vehicle Safety Standards pre-empted the suit. Id. at 283. According to
6  the relevant federal statute, once a federal safety standard was established, no state could
7  apply its own safety standard "to the same aspect of performance" regulated by the federal
8  standard. Id. at 284 (quoting 15 U.S.C. § 1392(d)).[5] At the time of the suit, there was no
9  federal standard regarding anti-lock braking systems. The manufacturers claimed, however,
10  that even "the absence of regulation itself constitutes regulation" such that the state claims
11  were pre-empted. Id. at 286. The Supreme Court rejected this claim, finding "no evidence"
12  of any federal intent to pre-empt all state regulation in this area; states were left free to
13  continue "their own safety standards concerning" anti-lock braking systems. Id. In short, the
14  Court held that "the absence of a federal standard cannot implicitly extinguish state common
15  law" claims. Id. at 282.

16      In this case, the parties agree that there is no federal standard regarding back-up
17  alarms. Also, it is not disputed that Plaintiffs' claims are based on Arizona tort law. Thus,
18  under Freightliner, the federal standards do not preempt Plaintiff's claims and do not establish
19  that Ford has not violated a duty. The two cases cited by Ford are not to the contrary. In
20  Cooper v. General Motors Corp., 702 So.2d 428 (Miss. 1997), the Supreme Court of
21  Mississippi held that a plaintiff's claim was preempted by specific language in the National
22  Traffic and Motor Vehicle Safety Act. Id. at 441. There is no such language in the Act
23  regarding backup alarms. And in Schwartz v. Volvo North America Corp., 554 So.2d 927
24  (Ala. 1989) the Supreme Court of Alabama held that a manufacturer's failure to install air
25  bags was not a cognizable claim *under Alabama law.* Id. at 928. The concurrence noted that
26  "[t]he majority refuses to reach the question of whether the . . . air bag claim is preempted

27

28      [5] The statute is now found at 49 U.S.C. § 30103(b).

- 9 -

1  by federal law." Id. at 929. Accordingly, the authorities cited by Ford are not applicable and

2  Ford's motion for summary judgment based on federal standards will be denied.

3        **2. Open and Obvious Condition**

4        Ford's next argument for summary judgment is that the semi-tractor's lack of a back-

5  up alarm was an open and obvious condition such that Plaintiffs cannot meet their burden of

6  proving that the semi-tractor was unreasonably dangerous.[6]   In support of this argument,

7  Ford cites to a number of Arizona cases, but not the most relevant decisions, as well as a

8  wide variety of authority from other jurisdictions. The "open and obvious" nature of the

9  semi-tractor's condition is only one factor to be considered in determining if a product is

10  unreasonably dangerous. Thus, Ford's motion for summary judgment on this issue will be

11  denied.

12        In Arizona, there are "two models of inquiry to determine whether a product was in

13  a 'defective condition unreasonably dangerous': the 'consumer expectation test' and the

14  'risk/benefit analysis.'" Golonka v. Gen. Motors Corp., 65 P.3d 956, 962 (Ariz. Ct. App.

15  2003). Determining which of these tests is appropriate often depends upon the type of defect

16  alleged. "The consumer expectation test works well in manufacturing defect cases because

17  consumers have developed safety expectations from using properly manufactured products

18  of the same general design." Id. at 962. But the consumer expectation test "has limited

19  utility" in design defect cases, based in part on "the problem of whether to measure consumer

20  expectations by objective or subjective standards." Golonka, 65 P.3d at 962; Dart v. Wiebe

21  Mfg., Inc., 709 P.2d 876, 879 (Ariz. 1985). Thus, "when application of the consumer

22

23

24        [6] Plaintiffs' products liability, negligence, and gross negligence claims depend on a
finding that the tractor was unreasonably dangerous. See Golonka v. Gen. Motors Corp., 65

25  P.3d 956, 962 (Ariz. Ct. App. 2003) (holding that strict products liability claim requires
showing product was unreasonably dangerous); Rossell v. Volkswagen of Am., 709 P.2d

26  517, 523 (Ariz. 1985) (stating negligence action required proof that manufacturer's actions

27  constituted an unreasonable risk of harm); Walls v. Ariz. Dept. of Pub. Safety, 826 P.2d
1217, 1221 (Ariz. Ct. App. 1991) (stating gross negligence requires showing that party's

28  conduct created "an unreasonable risk of bodily harm to others").

1    expectation test is unfeasible or uncertain in design defect cases, courts *additionally or*

2    *alternatively* employ the risk/benefit analysis." <u>Golonka</u>, 65 P.3d at 962 (emphasis added).

3    Pursuant to Arizona law, a court may use the consumer expectation test *and/or* the

4    risk/benefit test.

5        In this case, Ford has moved for summary judgment based solely on the open and

6    obvious nature of the defect. The open and obvious nature of a defect is one of the factors

7    under the risk/benefit test.[7]  Thus, it appears that at the time Ford filed its motion for

8    summary judgment it was relying, at least implicitly, on the risk/benefit test. Having chosen

9    that line of argument, Ford is not free to change its approach in its reply brief.[8]  Accordingly,

10    even if the defect in this case *was* open and obvious, summary judgment would not be

---

     [7]
     A court employing the risk/benefit test *may* rely on the following factors,

        (1) [t]he usefulness and desirability of the product,

        (2) the availability of other and safer products to meet the same
        need,

        (3) the likelihood of injury and its probable seriousness,

        (4) the obviousness of the danger,

        (5) common knowledge and normal public expectation of the
        danger (particularly for established products),

        (6) the avoidability of injury by care in use of the product
        (including the effect of instructions or warnings), and

        (7) the ability to eliminate the danger without seriously
        impairing the usefulness of the product or making it unduly
        expensive.

<u>Golonka</u>, 65 P.3d at 962 n.2 (citations omitted). The fourth factor implicates the "open and obvious" nature of the defect pressed by Ford.

     [8]  In its reply, Ford refines its argument by asserting for the first time that it believes the open and obvious nature of the defect is no longer the most important factor in favor of granting summary judgment. Instead, Ford believes that the consumer expectation test should be used. (Doc. 162) ("[T]he Court need not address . . . whether or not summary judgment is appropriate" based on the open and obvious nature of the defect.)

1   appropriate because a jury would be required to evaluate the other relevant factors as well.

2   The Court will deny Ford's motion for summary judgment.

3   **V. Punitive Damages**

4   In its third Motion for Summary Judgment, Ford argues that there is insufficient
5   evidence regarding its "evil mind" to justify an award of punitive damages. (Doc. 137, p.4)
6   Its claims are based on the requirements for punitive damages set forth by Arizona courts.
7   Ford also argues that the punitive damages regime in Arizona is unconstitutional. Plaintiffs
8   counter that there are ample facts to support an award of punitive damages and that there is
9   no reasonable basis to find the punitive damages regime unconstitutional. The Court finds
10   that Plaintiffs have not supplied sufficient admissible evidence to support a punitive damages
11   award. Thus, the Court need not address Ford's other arguments regarding punitive damages.

12   **A. Applicable Law**

13   First, Ford contends that Michigan, not Arizona, law may apply to the issue of
14   punitive damages. In its Reply to the Motion for Summary Judgment Regarding Punitive
15   Damages, Ford stated "[a]rguably, punitive damages are not awardable in this case because
16   Ford is a Michigan entity, and Michigan law does not allow for an award of punitive
17   damages." (Doc. 161, p.2) The Court need not address this "[a]rguably" position because
18   "it is improper for a party to raise a new argument in a reply brief." United States v. Boyce,
19   148 F. Supp. 2d 1069, 1085 (S.D. Cal. 2001); see also Eberle v. City of Anaheim, 901 F.2d
20   814, 818 (9th Cir. 1990) ("It is well established in this circuit that the general rule is that
21   appellants cannot raise a new issue for the first time in their reply briefs."). Ford waived this
22   argument by not properly raising it and the Court will address the punitive damages
23   arguments pursuant to Arizona law.

24   **B. Requisite Mental State**

25   In Arizona, "[t]o recover punitive damages, a plaintiff must prove by clear and
26   convincing evidence that the defendant engaged in aggravated and outrageous conduct with
27   an 'evil mind.'" Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn, 907 P.2d 506, 518

28

1   (Ariz. Ct. App. 1995) (quoting Thompson v. Better-Bilt Aluminum Prod. Co., 832 P.2d 203,

2   209 (Ariz. 1992). "A defendant acts with the requisite evil mind when he intends to injure

3   or defraud, or deliberately interferes with the rights of others, 'consciously disregarding the

4   unjustifiable substantial risk of significant harm to them.'"  Id. (quoting Linthicum v.

5   Nationwide Life Ins. Co., 723 P.2d 675, 680 (Ariz. 1986). An evil mind may be inferred but

6   there must be both an evil mind *and* "aggravated and outrageous conduct" to support an

7   award of punitive damages. Linthicum, 723 P.2d at 680; see also Hyatt Regency, 907 P.2d

8   at 518 ("The plaintiff may meet the clear and convincing standard by either direct or

9   circumstantial evidence which persuades the jury of the high probability of the defendant's

10  evil mind."); Thompson, 832 P.2d at 210 ("A jury certainly may infer evil mind when a

11  defendant continues a course of conduct with knowledge of the past harm caused by that

12  conduct.").

13        According to Ford, Plaintiffs have presented insufficient evidence that Ford "acted

14  with an evil mind, intending to cause harm to Mr. Beville." (Doc. 137 p.3) Ford believes

15  that "[a]n act or omission that is merely thoughtless or careless is not enough; plaintiffs must

16  prove that Ford acted with actual conscious indifference to the unusual risk." (Id.) Plaintiffs

17  do not dispute that evidence of an evil mind is necessary. Rather, Plaintiffs contend that their

18  evidence is at least sufficient to defeat summary judgment. When evaluating conduct

19  regarding an evil mind, a court may look to a number of factors, including "(1) the

20  reprehensibility of defendant's conduct and the severity of the harm likely to result, (2) any

21  harm that has occurred, (3) the duration of the misconduct, (4) the defendant's awareness of

22  the harm or risk of harm, and (5) any concealment of it." Hyatt Regency, 907 P.2d at 518.

23        It is clear in Arizona that a summary judgment motion "on the issue of punitive

24  damages must be denied if a reasonable jury could find the requisite evil mind by clear and

25  convincing evidence. Conversely, the motion should be granted if no reasonable jury could

26  find the requisite evil mind by clear and convincing evidence." Thompson, 832 P.2d at 211.

27  Plaintiffs argue that construing "the evidence and all reasonable inferences that may be

28

1 drawn from the evidence . . . in a light most favorable to [Plaintiffs]" leads to the conclusion

2 that a reasonable jury could find Ford acted with an evil mind. As possible evidence of the

3 requisite evil mind, Plaintiffs cite the following propositions:

4       •     Ford has long been aware of the existence and benefits of back-up alarms and has included them on its products;

5

6       •     Ford has long recognized the risks associated with backing heavy equipment and trucks, particularly those with limited rearward visibility;

7       •     Ford knew at the time it marketed the Aeromax that it was foreseeable that it would be used with a trailer and that rearward visibility would be severely

8               restricted or completely obstructed;

9       •     Ford knew for many years the serious and often deadly hazards associated with backing such a large vehicle without being able to see behind it;

10

11       •     Ford engineers were required by Ford to identify hazards in its products and perform failure mode and effect analyses to address those hazards;

12       •     Ford engineers were obligated to warn users of hazards that could not be designed out or guarded against;

13

14       •     Ford failed to perform analyses and failed to follow Ford policies and accepted protocol relative to the hazards associated with backing the Aeromax, and, thus, made a conscious decision to avoid warning against this hazard;

15

16       •     Contrary to internal policies, Ford took no steps to address this known hazard;

17       •     Ford knew all of these things prior to Paul Beville's death. In spite of this knowledge, Ford continued to sell the 1997 Ford Aeromax without a back-up alarm or any other audible warning device or near-object detection system.

18 (Doc. 146 p.7) Plaintiffs argue this is enough to support an award of punitive damages

19 because it shows a "conscious and deliberate disregard of the interests and rights of others."

20 Gurule v. Illinois Mut. Life and Cas. Co., 734 P.2d 85, 87 (Ariz. 1987). The Court concludes

21 even if there is evidence to support each of these propositions it is insufficient to support an

22 award of punitive damages.

23 The Arizona Supreme Court case of Volz v. Coleman Company, Inc., 748 P.2d 1191

24 (Ariz. 1987) demonstrates that Plaintiffs' evidence is legally insufficient for an award of

25 punitive damages. In Volz, a five-year-old had been severely burned when fuel sprayed from

26 a Coleman stove. Id. at 1192. The accident was due to the type of cap Coleman used on its

27 stoves. Id. Internal documents showed that Coleman was aware fuel might be sprayed as

28

- 14 -

1    a result of the cap's design. Id. at 1193. Other internal documents were introduced showing

2    "the defects in the . . . cap and improvement that would be gained by redesigning the [cap]."

3    Id. Also, "[d]espite Coleman's knowledge of the possibility of fuel spraying . . . no warnings

4    were issued advising the user" of the danger of spraying fuel or how to avoid accidents. Id.

5    at 1194. The Court found that Coleman's actions evidenced "negligence, or even gross

6    negligence" but not the "'something more' than gross negligence required" by Arizona law

7    to support an award of punitive damages. Id. at 1195.

8        The evidence cited by Plaintiffs in support of their punitive damages claim is analogous

9    to the evidence in Volz. Like Coleman Company in Volz, Ford had long been aware of the

10    danger posed by its product. Also, Coleman Company's cap was only dangerous in certain

11    environments (such as close to an open flame) just as the danger of Ford's product depended

12    on the environment in which it was being used (the efficacy of back-up alarms depends on

13    the environment in which they are being used). (Vaughn Adams' Depo. p. 104) But unlike

14    Coleman Company in Volz, it is undisputed that Ford attempted to warn consumers of the

15    danger posed by its product. Ford advised consumers that "[i]f other persons are in the

16    vicinity [of the backing truck], have someone standing well behind the vehicle and outside

17    your intended path . . . guide you as you back up." Also, one of Plaintiffs' experts opined that

18    a truck may be safe without a back-up alarm. (Robert Coulter Depo. p. 35) (stating that

19    safety of a certain truck depended on "the type of operation and areas" the truck was being

20    used in). In light of this evidence, the Court concludes that there is insufficient evidence of

21    Ford's "evil mind" to support an award of punitive damages. Accordingly, Ford's motion for

22    summary judgment on the issue of punitive damages will be granted and the court need not

23    address Ford's claims regarding the constitutionality of Arizona's punitive damages scheme.

24    **VI. Plaintiffs' Summary Judgment Motion**

25        In their Motion for Summary Judgment, Plaintiffs ask the Court to prevent Ford from

26    asserting certain defenses. The defenses Plaintiffs wish to preclude are 1) contributory

27    negligence, 2) misuse, 3) modification or alteration of the product, 4) the product complied

28

1  with the state of the art, 5) the product was not defective because the consumer is responsible
2  for deciding what safety equipment is needed, and 6) Ford had no duty to supply a safety
3  device not mandated by federal law.  In its response, Ford states that it will not assert the
4  misuse or modification defense.  Also, the Court has already rejected Ford's claim that it had
5  "no duty to equip its vehicles with a safety device not mandated by Federal Motor Vehicle
6  Safety Standards."[9]  Accordingly, only three of the defenses, contributory negligence, state
7  of the art, and the consumers' responsibility, need be addressed.

8  **1. Contributory Negligence**

9  Plaintiffs are asserting a strict liability claim as well as negligence based claims. They
10  seek summary judgment that Ford may not assert contributory negligence as a defense in
11  relation to their strict liability claim.[10]  In Jimenez v. Sears, Roebuck and Co., 904 P.2d 861,
12  864 (Ariz. 1995), the Arizona Supreme Court made it abundantly clear that "[c]ontributory
13  negligence is not applicable to strict liability" claims.  Ford argues in its impermissibly long
14  response[11] that this Court should apply "a different interpretation of Arizona law than
15  expressly stated in Jimenez." (Doc. 144 p. 16)  Ford is apparently confounded about basic
16  federal procedure.  A federal court simply has no power to overrule the Arizona Supreme
17  Court on an issue of Arizona law. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("Except
18  in matters governed by the Federal Constitution or by acts of Congress, the law to be applied

19

20  [9] In its response, Ford claims that Plaintiffs are misrepresenting their position. (Doc.
21  144 p. 11) Ford devotes the majority of its argument to the claim that it is merely seeking
   to introduce evidence regarding federal safety mandates.  But at the end of the relevant
22  section Ford claims that "summary judgment should be entered for Ford because it complied
   with [federal] regulations." (Doc. 144 p.14) To the extent that Ford wishes to have admitted
23  certain evidence, that claim will be addressed at the Final Pretrial Conference. But Ford's
   claim that it has no duty to install a back-up alarm because federal law does not require an
24  alarm is a misstatement of the law and will not be considered.

25

26  [10] Plaintiffs concede that contributory negligence may be asserted by Ford in response
   to their negligence claims. (Doc. 140 p. 6 n.1)

27  [11] The response filed by Ford was twenty-four pages, seven pages over the length
28  allowed by Local Rule.

- 16 -

1  in any case is the law of the state. And whether the law of the state shall be declared by its

2  Legislature in a statute or by its highest court in a decision is not a matter of federal

3  concern."). Accordingly, Plaintiffs' motion for summary judgment on the issue of

4  contributory negligence will be granted.

5  **2. State of the Art**

6  Plaintiffs also seek a determination that Ford may not assert the state-of-the-art

7  defense at trial. According to Arizona Revised Statutes section 12-683, "[i]n any product

8  liability action, a defendant shall not be liable if the defendant proves that . . . the product

9  conformed with the state of the art at the time the product was first sold by the defendant."

10  "State of the art" is defined elsewhere as "the technical, mechanical and scientific knowledge

11  of manufacturing, designing, testing or labeling the same or similar products that was in

12  existence and reasonably feasible for use at the time of manufacture." A.R.S. § 12-681(10).

13  Plaintiffs argue that Ford admits that it could have installed a back-up alarm at the time the

14  tractor was manufactured. (Doc. 140 p. 8-9) This, according to Plaintiffs, proves that a

15  back-up alarm was a feasible step Ford could have taken and the state of the art defense

16  should not be allowed. Ford believes that the state of the art defense contemplates relying

17  on industry standards and the industry standard was *not* to install back-up alarms. Plaintiffs'

18  interpretation of the defense is correct.

19  Golonka v. General Motors Corp., 65 P.3d 956 (Ariz. Ct. App. 2003), included a

20  discussion of the applicability of the state of the art defense.[12] In that case, General Motors

21  argued that the written warnings it had provided were state of the art. The court rejected this

22  argument, finding that General Motors' "written warnings . . . were state of the art only if the

23  more specific warnings proposed by Plaintiffs were not 'in existence and reasonably feasible

24  for use at the time of manufacture.'" Id. at 974. Because the "evidence [did] not demonstrate

25  _____

26  [12] "[A]n intermediate state appellate court decision is a 'datum' for ascertaining state

27  law which is not to be disregarded by a federal court unless it is convinced by other
persuasive data that the highest court of the state would decide otherwise . . . ." Katz v.

28  Children's Hosp. of Orange County, 28 F.3d 1520, 1529 (9th Cir. 1994) (quotations omitted).

- 17 -

1   that issuing better written warnings was either not feasible or inadvisable," General Motors
2   could not use the state of the art defense. Id. Here, Ford does not argue that back-up alarms
3   were not in existence or reasonably feasible at the time the tractor was manufactured.
4   Accordingly, Ford may not rely on the state of the art defense. Plaintiffs' summary judgment
5   motion on this issue will be granted.

### 3. Consumers' Responsibility

7   The final defense Plaintiffs' wish to preclude is that an end user has a responsibility
8   to make a product safe. Ford believes that the ultimate consumer of their tractor was in the
9   best position to decide if a back-up alarm was appropriate.[13] It does not appear that any
10   Arizona court has squarely addressed whether a manufacturer has a nondelegable duty to
11   produce a reasonably safe product. But in Torres v. Goodyear Tire & Rubber Co., Inc., 786
12   P.2d 939, 942 (Ariz. 1990), the Arizona Supreme Court observed that the rationale behind
13   strict liability in defective product actions is "to spread the risk from one to whom a defective
14   product may be a catastrophe, to those who marketed the product, profit from its sale, and
15   have the know how to remove its defects before placing it in the chain of distribution."
16   Under this formulation of strict liability, Ford must remain liable for producing a defective
17   product.  It would be completely contrary to the strict liability doctrine to allow Ford to
18   produce a unreasonably dangerous product and shift to the end user the duty to make that
19   product safe. Accordingly, Plaintiffs' motion for summary judgment regarding an end user's
20   duty to make a product safe will be granted.

21   **VII. Motions to Strike**

22   There are currently seven pending motions to strike and one pending motion for leave
23   to file excess pages. Each of those motions is addressed below.

24   **1. Docket # 139, Plaintiffs' Motion to Strike Ford's Notice of Non-Parties at**
25   **Fault**

---

27   [13] Ford may take issue with this characterization of its position. However, Ford has
28   repeatedly stated that the end user may be at fault due to the decision not to install a back-up
     alarm. (Doc. 164 p. 4 quoting sources)

1    On Jun 18, 2003, Ford filed a Notice of Non-Party at Fault. In that notice, Ford

2  named Bingham Equipment Company and Bingham's employee James Sears as possible non-

3  parties at fault. Ford later amended their notice by adding Paul Beville IV as another

4  possible non-party at fault. On March 18, 2005, Plaintiffs filed a Motion to Strike Ford's

5  Notice of Non-Parties at Fault. That motion was based on Plaintiffs' belief that Paul Beville

6  IV cannot be a "non-party at fault" because he was already a party to the suit. The motion

7  also stated that Ford had "no factual support for finding Bingham to be at fault." (Doc. 139)

8    Plaintiffs' claims are based on Arizona's wrongful death statute as well as Arizona's

9  survival statute. The court in Barragan v. Superior Court of Pima County, 470 P.2d 722, 724

10  (Ariz. Ct. App. 1970), described the differences between the two statutes: "A wrongful death

11  action is an original and distinct claim for damages sustained by the statutory beneficiaries

12  and is not derivative of or a continuation of a claim existing in the decedent. A survival

13  statute, on the other hand, does not create a new claim but merely prevents abatement of the

14  injured person's claim and provides for its enforcement by his personal representative." Id.

15  (citation omitted). Pursuant to this reasoning, Plaintiffs' claims based on the survival statute

16  are actually the claims of the decedent, Paul Beville IV. Thus, Paul Beville IV is already a

17  party to this action in the sense that Plaintiffs are proceeding under the survival statute. In

18  this context, the request to name Paul Beville IV a "non-party at fault" is incoherent and will

19  be denied.[14]

20    Plaintiffs also seek to prevent Ford from naming Bingham Equipment as a non-party

21  at fault. In the last Notice of Non-Party at Fault filed by Ford, Bingham Equipment is named

22

23

24    [14] Ford curiously states that "[e]ven if this Court was to find that Paul Beville is a
      party to this lawsuit, Ford has given plaintiffs notice of its claim that Paul Beville was
25    negligent and therefore it is proper for his name to appear on the verdict form for the jury to
      allocate fault." (Doc. 143) It appears that Ford concedes that Paul Beville IV may be a party
26    to this action, but wants to preserve its right to assert comparative fault. Having determined
      that Paul Beville is a party to this action, Ford may assert comparative fault where it is
27    appropriate, but may not name Paul Beville as a non-party at fault. See Section VI(1) (stating
28    that comparative fault is not appropriate in a strict liability action).

1 because "the Industrial Commission's report . . . indicates that Bingham Equipment should
2 have had a company policy that provided that anyone backing up in any type of vehicle that
3 is in the yard should sound the horn.  No such policy has been produced by Bingham
4 Equipment." (Doc. 23) Plaintiffs argue that Ford produced no evidence "that Bingham had
5 a duty to develop" such a policy and that Ford's own expert has testified that an audible
6 warning would not have prevented this accident.  (Doc. 139 p.7) In its response to the
7 motion to strike, Ford does not address Plaintiffs' argument but chooses instead to support
8 the notice of non-party at fault based on different theories, such as Bingham Equipment's
9 failure to train their employees. These new theories were not mentioned in the original notice
10 as required by law.  See Ariz. R. P. 26(b)(5) (requiring party to disclose facts that support
11 theory of liability). Ford may not change its theory at this late stage. See Webster v. Crown
12 Controls Corp, 974 F. Supp. 1284, 1287 n.2 (D. Ariz. 1996) (observing that even lack of
13 prejudice does not excuse party from complying with non-party at fault notice requirements).
14 Accordingly, the motion to strike Bingham Equpiment as a non-party at fault will be granted.

15 **2.  Docket # 150, Plaintiffs' Motion to Strike Ford's Response to Summary**
16 **Judgment Motion**

17 In this motion, Plaintiffs seek to strike Ford's response to a motion for summary
18 judgment based on non-compliance with Local Rule 7.2(e). The response filed by Ford was
19 twenty-four pages, seven pages over the length allowed by 7.2(e). The impermissible length
20 is especially troubling in light of the extra pages being used to ask this court to commit
21 obvious legal error. See Part VI(1) (stating that overruling Arizona Supreme Court on issue
22 of Arizona law would be obvious legal error).  In light of the Court's desire to adjudicate this
23 case on its merits, the Court will grant the request  to exceed page limits filed after-the-fact.
24 (Doc. 155) The motion to strike will be denied.

25 **3.  Docket # 151, Plaintiffs' Motion to Strike Ford's Response on Issue of Non-**
26 **Parties at Fault**

27
28

1    In this motion, Plaintiffs seek to strike Ford's response to another motion based on the
2    response being filed twelve days late.  Ford's counsel claims that they were confused about
3    the amount of time they had to file a response.  (Doc. 154) Because the Court will grant
4    Plaintiffs' motion that was the subject of the untimely response, this motion to strike will be
5    denied as moot.

6        **4.  Docket # 157 and 158, Plaintiffs' Motions to Strike Portion of Ford's**
7    **Statement of Facts**

8        These two motions to strike ask the Court to disregard certain portions of Ford's
9    Statements of Fact submitted in connection with Ford's summary judgment motions.  The
10   Court need not address the merits of these motions because the documents at issue were not
11   used in resolving the motions for summary judgment.  Therefore, these motions will be
12   denied.  The admissibility of the relevant documents, however, remains an issue that must
13   be resolved at a later date if Ford offers them for admission at trial.

14       **6. Docket # 167, 168 Ford's Motions to Strike Plaintiffs' Motion to Strike**

15       Rather than simply responding to the motions to strike filed by Plaintiffs, Ford chose
16   to respond *and* asked the Court to strike the motions to strike.  It is entirely unclear what Ford
17   sought to achieve by this tactic.  When the Plaintiffs filed their motions to strike, they were
18   seeking to prevent the Court from considering allegedly inadmissible information.  No such
19   laudable goal is attained by striking a motion to strike; instead of just responding to the
20   motions on their merits, Ford has needlessly multiplied litigation.  The motions will be
21   denied.

22       Accordingly,

23       **IT IS ORDERED** that Ford's Motion for Summary Judgment Regarding <u>Daubert</u>
24   (Doc. 135) is **DENIED**.

25       **IT IS FURTHER ORDERED** that Ford's Motion for Summary Judgment (Doc. 136)
26   is **DENIED**.

27

28

- 21 -

1   **IT IS FURTHER ORDERED** that Ford's Motion for Summary Judgment Regarding
2   Punitive Damages (Doc. 137) is **GRANTED**.

3   **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc.
4   140) is **GRANTED**.

5   **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike (Doc. 139) is
6   **GRANTED** to the extent that neither Paul Beville IV nor Bingham Equipment may be
7   named as a non-party at fault.

8   **IT IS FURTHER ORDERED** that Plaintiffs' Motions to Strike (Doc. 150, 151, 157,
9   158) are **DENIED**.

10   **IT IS FURTHER ORDERED** that Ford's Request for Leave to File Excess Pages
11   (Doc. 155) is **GRANTED**.

12   **IT IS FURTHER ORDERED** that Fords' Motion to Strike (Doc. 167, 168) are
13   **DENIED**.

14   **IT IS FURTHER ORDERED** the parties file a Joint Proposed Pretrial Order, all
15   Motions in Limine, a Joint Statement of the Case, the Joint Jury Instructions, a Verdict Form,
16   and Stipulated Voir Dire Questions by May 1, 2006.

17   **IT IS FURTHER ORDERED** the Final Pretrial Conference is set for June 23, 2006
18   at 1:30 pm.

19   **IT IS FURTHER ORDERED** jury trial is set for August 8, 2006 at 8:30 am.

20
21   DATED this ~~day~~ March 31, 2006.
22
23
24   Roslyn O. Silver
     United States District Judge
25
26
27
28